BROWN, Chief Judge.
|, Defendant, Mark Lewis Smith, was convicted by a jury of two counts of armed robbery and one count of attempted armed robbery. He was subsequently adjudicated a third felony offender and sentenced to 66 years’ imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on each armed robbery count and to 30 years at hard labor without the benefit of probation or suspension of sentence on the attempted armed robbery conviction, with all three sentences to run concurrently. This was the mandatory minimum sentence. Defendant has appealed his convictions and sentences. We affirm.

Discussion

According to defendant, the evidence was insufficient to support the two armed robbery convictions; he does not question the attempted armed robbery conviction. Defendant points out that the three victims testified that the two assailants left the scene without taking any of the victims’ property. Defendant argues that his armed robbery convictions should be reversed and asks that this court enter convictions for the lesser included offense of attempted armed robbery and remand for sentencing.
The two assailants were defendant, Mark Lewis Smith, and a co-defendant, Michael Jerome Taylor. They were initially charged by bill of information filed with three counts of armed robbery committed on July 29, 2009. The bill named Christopher “Shawn” Masters, Michael “Bryan” Smithpeter, and Jonathan Miller as the three victims of the armed robberies. Pri- *746 or to trial, a new bill of information was filed deleting Michael Jerome Taylor as a co-defendant. By unanimous verdicts, the jury found defendant | ^guilty of armed robbery of Smithpeter and Masters and guilty of attempted armed robbery of Miller.
At trial, all three victims testified to the events which occurred in the early morning hours of July 29, 2009, outside Central Station, a downtown Shreveport nightclub located in an old train station, where Jonathan Miller worked as a bartender/shift supervisor. Miller was responsible for closing the nightclub on that particular morning, a responsibility which includes completing paperwork, setting the alarm, locking the doors, and making sure everyone has left the parking lot. Two of Miller’s friends, Bryan Smithpeter and Shawn Masters, stayed with him as he was closing up and walked out of the nightclub just ahead of Miller. As they exited the building at approximately 2:45 a.m., Miller noticed two men standing in the parking lot under a train viaduct which sits over the nightclub parking area. The three started to walk to their vehicles which were parked adjacent to the door they had just exited.
According to Miller, as he got to his truck, he was approached by a white male, whom he identified at trial as defendant. The man asked Miller for a cigarette. Miller stated that he did not have any cigarettes. Defendant then stated, “Hey, never mind,” at which time Miller turned back towards defendant who was pointing a chrome .38 caliber revolver at him. Defendant then ordered Miller and his friends to the other side of Smithpeter’s vehicle where they were out of view of the nightclub’s surveillance cameras. Once there, defendant ordered them to empty their pockets. Defendant’s accomplice, ultimately determined to be Michael | .¡Taylor, started to pat down the victims. Miller described Taylor as a thin black male with white discoloration of the skin on his neck and hands. Miller indicated that he did not have the opportunity to empty his pockets because he was in the process of being patted down by Taylor. During this time, defendant kept the gun trained on all three victims as he demanded their cell phones, IDs and money. When asked why he wanted their IDs, defendant told the victims that if they called the police he would use the IDs to find and kill them.
Finding little money on their victims, Taylor told defendant that they should just leave but defendant insisted that they take the victims’ phones. Ultimately, Miller testified that defendant and Taylor took off without taking anything from them. Miller testified that Masters got in his car and left while Smithpeter called 911. When law enforcement arrived, Miller and Smithpeter told one of the responding officers what had happened and provided descriptions of their assailants.
Shawn Masters’ testimony of the events of that evening was consistent with Miller’s with a few exceptions. Masters said that defendant ordered them to kneel on the ground, but his testimony does not indicate whether the three men complied with that command. The victims were then ordered to take everything out of their pockets and put the things on the ground. Masters said that he took out his wallet, cell phone, and approximately 50 cents and laid them on the ground. Asked whether “[a]t this point” either of the assailants picked up the items, Masters answered, “no.” When the two men left, Masters picked up his items. Masters stated |4that he was scared and that when Miller told him to go ahead and leave, he drove off without waiting for the police to arrive. Masters had no recollection of whether verbal threats were made or *747 whether he was patted down by the black assailant.
Bryan Smithpeter’s testimony also largely tracked that of Masters and Miller with the exception that Smithpeter testified that after the three men put their property on the ground, the black assailant picked up the victims’ wallets and went through them looking for cash. Smithpeter testified that the black male took his $2.00. Subsequently on cross-examination, however, Smithpeter testified that nothing “was taken from” him and that all of his “items were left.” In fact, the black robber gave him his $2.00 back and told him, “man, I don’t need your two dollars.” Smithpeter stated that during the robbery defendant was waving the gun around in a threatening manner and was making verbal threats about killing the victims if they went to the police.
During their testimony, all three victims made unequivocal in-court identifications of defendant as the white assailant who wielded the handgun during the robbery. Their testimony varied slightly as to the verbal threats made during the incident, but all concurred that the handgun was being waved in their faces as they were ordered to turn over their money, mobile phones and IDs; however, all three said that the assailants did not leave with any of their property.
Detective Jack Miller of the Shreveport Police Department explained his investigation and how he first developed Michael Taylor as a suspect in |sthe robbery, how Miller and Smithpeter had each picked Taylor out of a photographic lineup as the black assailant, and how the subsequent investigation of Taylor led officers to consider defendant as a suspect. Detective Miller testified that once officers had identified defendant as a suspect, they prepared a photo line-up and called Miller to have him look at it. During the call, Miller indicated that he wanted the detective to show the line-up to Masters as well, which Det. Miller testified, was the first time he became aware that there was a third victim. Detective Miller showed the line-up to Miller and Masters separately and both identified defendant as the white assailant on the night of the robbery.

Sufficiency of the Evidence

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. The appellate court does not assess the credibility of witnesses or reweigh evidence. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Eason, 43,788 (La.App.2d Cir.02/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; cert. denied, - U.S. -, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010).
The elements of armed robbery are: (1) a taking; (2) of anything of .value; (3) from the person or in the immediate control of another; (4) by the use of force or intimidation; (5) while armed with a dangerous weapon. La. R.S. 14:64; State v. Carter, 98-24 (La.App.5th Cir.05/27/98), 712 So.2d 701, writ denied, 98-1767 (La.11/06/98), 727 So.2d 444.
The only issue in the case sub judice is whether there was a “taking of anything of value.” As it regards armed robbery, the *748 Louisiana Supreme Court has defined a “taking” as “the slightest asportation” of anything of value. State v. Neal, 275 So.2d 765 (La.1973); State v. Cittadino, 628 So.2d 251 (La.App. 5th Cir.1993); State v. Conrad, 620 So.2d 366 (La.App. 5th Cir.1993), writ denied, 94-3076 (La.04/07/95), 652 So.2d 1345. Furthermore, in discussing the concept of “taking” in the context of theft, the Louisiana Supreme Court held in State v. Victor, 368 So.2d 711 (La.1979), that a “taking” includes an intent to usurp or negate the owner’s dominion. In State v. Victor, the court determined that the factual issue of whether there is a taking for purposes of theft is “whether the offender exerts control over the object adverse to or usurpato-ry of the owner’s dominion.” Id. at 714. “Anything of value” must be given the broadest possible construction, including any conceivable thing of the slightest value. La. R.S. 14:2(2).
In State v. Draughn, 05-1825 (La.01/17/07), 950 So.2d 583, 593-594, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007), |7a first degree murder case, the defendant claimed that there was no evidence that a robbery occurred and that the evidence did not distinguish his case from others where the murder was committed as part of a personal grudge or vendetta, the court stated:
The defense argues that there was insufficient evidence that something of value was taken from Ms. White, so that the underlying felony of robbery was not proved beyond a reasonable doubt. The defense points to testimony of Cornell White, the victim’s son, who admitted that his mother could have spent the $20 that he knew she had with her when he last saw her. Mr. White also testified that there were items of value undisturbed in the house.
As this court held in State v. Neal, 275 So.2d 765, 770 (La.1973), whether or not anything of value was actually taken by the accused in an armed robbery context is a question of fact for the jury to weigh and evaluate in their consideration of the verdict. In Neal, an armed robber and his accomplice entered a gun shop and accosted the owner. The armed robber demanded the owner’s wallet. When the owner handed over his wallet with one hand, he brought out a gun with the other hand and fired. The robber dropped the wallet and started to run away. The owner admitted on cross-examination that nothing was ultimately taken from his person or his shop. In affirming a conviction for armed robbery, this court held “that the slightest asportation of anything of value ... the slightest deprivation for the slightest period of time ... the slightest segregation of the property moved the slightest distance is sufficient to satisfy the element of a theft, which is part of the crime charged.” Neal, 275 So.2d at 770. The court found that the jury, in weighing and evaluating the testimony, “chose to believe that indeed the robber did have, at some time if only momentarily, [the owner’s] wallet in hand.” Id.
[[Image here]]
Moreover, the murder of Ms. White allowed the perpetrator the leisure to move around her house, closing curtains for privacy, and possessing and assessing all of Ms. White’s possessions, not just her wallet and checkbook. Undoubtedly, the perpetrator handled the contents of Ms. White’s purse, whether there was any money in the purse to steal or not. Whether the perpetrator ultimately took anything of value belonging to Ms. White out of the house is irrelevant in this context. See Neal, 275 So.2d at 770. A rational juror could have found proven beyond a reasonable *749 doubt that Ms. White was stabbed with a knife until she sustained fatal wounds so Isthat her assailant could possess and search through her house for items of value.
As noted above, Bryan Smithpeter testified that the black assailant went through the victims’ wallets that had been placed on the ground in front of them and that he had taken Smithpeter’s $2.00. He was acting as directed by defendant while defendant kept the victims at gunpoint. La. R.S. 14:24 provides that all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
While defendant has characterized the victims’ in-court statements as inconsistent with those given to police during the investigation, the record does not support this contention. While all of the victims’ statements were to the effect that nothing was taken from the scene by the assailants, these statements do not absolve defendant of the crime of armed robbery, nor are they inconsistent with Smithpeter’s testimony that the black assailant temporarily grabbed his money and the victims’ wallets.
As stated by the supreme court in State v. Neal, supra, 275 So.2d at 770, “the slightest asportation of anything of value ... the slightest deprivation for the slightest period of time ... the slightest segregation of the property moved the slightest distance is sufficient to satisfy the element of a theft, which is part of the crime charged.” (Emphasis added). A rational juror, in weighing and evaluating the testimony, could have reasonably found proven beyond a reasonable doubt a taking of control of the victims’ property. Jurors were allowed to use their common sense and Inexperience to conclude that such a segregation of property occurred. A reading of the evidence in the light most favorable to the prosecution supports the conclusion that defendant took, however briefly, something of value from both Smithpeter and Masters by the use of force or intimidation while armed with a dangerous weapon. La. R.S. 14:64. While the taking was of a thing of minimal value and for only the briefest amount of time (whether in holding the money or searching the wallets), all of the elements necessary for an armed robbery were met. The nature of defendant’s conduct was not changed because he ultimately decided he did not want what little the victims had.
Moreover, this view of the evidence best explains the verdicts reached by the jury. As noted above, Miller was the only one of the three victims who did not empty his pockets or place anything onto the ground. Both Smithpeter and Masters testified that they had placed their wallets on the ground in front of them. That testimony, combined with Smithpeter’s testimony that the black assailant searched the wallets in front of them, would explain the jury’s verdict that both Smithpeter and Masters had been the victims of armed robberies, while Miller was only the victim of an attempted armed robbery.
The inquiry seems to be whether the victim loses and the defendant gains control of the thing of value, an explanation akin to how the court defined a taking in the context of theft in State v. Victor, swpra, i.e., when the offender exerts control over the object adverse to or usurpato-ry of the owner’s dominion. In the instant case, it is indisputable that the victims’ | mcontrol over the items they had placed on the ground in front of them had been usurped by defendant and his accomplice. The victims were not free to pick up any of *750 their possessions as long as defendant was holding them at gunpoint.

Excessive Sentence

The state filed a habitual offender bill seeking an adjudication of defendant as a third felony offender. Defendant was adjudicated a third felony offender based on convictions for attempted felony criminal damage to property and possession ■with intent to distribute a Schedule II controlled dangerous substance, methamphetamine.
Counsel for defendant filed a Dorthey motion seeking a downward departure from the statutory minimum required for each of defendant’s three convictions. The motion was denied and defendant was sentenced to the statutory minimum terms of 66 and 30 years’ imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. All sentences are to be served concurrently.
Since the habitual offender law is constitutional in its entirety, the minimum sentences it imposes upon recidivists are also presumed to be constitutional. State v. Johnson, 97-1906 (La.08/04/98), 709 So.2d 672; State v. Dorthey, 623 So.2d 1276 (La.1993). The Johnson court addressed the issue of mandatory sentences in the context of the habitual offender law. In that case, the court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing [n evidence that he is exceptional; namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. Id. at 676.
A defendant’s age is insufficient justification for a downward departure. See State v. Lee, 09-37 (La.App. 5th Cir.05/12/09), 15 So.3d 229. A defendant’s record of nonviolent offenses may play a role in a sentencing judge’s determination that a minimum sentence is too long, but it cannot be the only reason, or even the major reason, for declaring such a sentence excessive. State v. Johnson, supra. Drug addiction has also been found insufficient to rebut the presumption of the constitutionality of a defendant’s enhanced life sentence under the multiple offender statute. State v. Baker, 00-1050 (La.App. 5th Cir.11/15/00), 776 So.2d 1212, writ denied, 01-0044 (La.11/16/01), 802 So.2d 621.
As noted above, the trial court sentenced defendant to the mandatory minimum sentence available under the habitual offender statute. Defendant did not appeal his adjudication as a third felony offender. On the issue of exceptional circumstances justifying a downward departure from the mandatory sentence, defendant put on evidence that he had made significant post-arrest efforts at rehabilitation. He had friends and family testify to his possible drug addiction and a less than perfect childhood.
While his post-arrest efforts at rehabilitation may be admirable, such efforts are not a reflection of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the | ^offender, and the circumstances of the case. A defendant obviously has an incentive for good behavior while he is awaiting sentence and acting in accordance therewith does not render him exceptional. As to defendant’s alleged drug problem, not only does the jurisprudence deem this to be insufficient to rebut the presumption of constitutionality, but the evidence was not clear and convincing as to whether such an addiction existed.
Lastly, defendant argues that the “weak evidence” forming the basis of his eonvic *751 tion should have been considered in determining whether a downward departure was warranted. Defendant did not contest on appeal any element of the crime other than the presence of a taking. That was based upon the fact that the victims were not carrying anything of significant value at the time of the robbery. The trial court did not err in concluding that the victims’ circumstances did not render defendant exceptional for the purposes of justifying a downward departure from the habitual offender mandatory minimum sentence.
This assignment is therefore without merit.

Conclusion

For the foregoing reasons, defendant’s convictions and sentences are affirmed.